**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ELLIOTT & FRANTZ, INC., JAMES ELLIOTT, and CATHERINE ELLIOTT,** | ) | |
| **Plaintiffs,** | ) | **Case No. 3:25-cv-01495** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| **WIRTGEN AMERICA, INC.,** | ) | |
| **Defendant.** | ) | |

# MEMORANDUM

Before the court are defendant Wirtgen America, Inc.'s ("Wirtgen") Motion for Judgment on the Pleadings (Doc. No. 68) and the Motion for Leave to File a Second Amended Complaint (Doc. No. 72) filed by plaintiffs Elliott & Frantz, Inc. ("Elliott & Frantz"), James Elliott ("Jim"), and Catherine Elliott ("Catherine").[1] For the following reasons, Wirtgen's motion will be granted in its entirety. Wirtgen's motion seeking a declaration of its rights under the Agreement will be granted. (Doc. No. 60 ¶¶ 104–18.) Counts 1 through 7 of the First Amended Complaint (Doc. No. 18 ¶¶ 88–129) will be dismissed in their entirety. The plaintiffs' motion for leave to amend will also be denied as futile.

## I. BACKGROUND

### A. The Parties' Agreement

Wirtgen is a Tennessee-based supplier of road construction and surface mining equipment. (Doc. No. 18 ¶¶ 1, 19, 35.) Wirtgen is a subsidiary of Wirtgen Group, an international construction

[1] For ease of reference and because the parties do so, the court will, uncharacteristically, use first names herein.

firm based in Germany that was acquired in 2017 by John Deere & Co. ("Deere"). (*Id.* ¶¶ 4, 19.) Before the acquisition, Wirtgen relied on a network of independent dealers to distribute, sell, and service its products throughout North America. (Doc. No. 66 ¶ 27.) Elliott & Frantz is one such dealer.

Elliott & Frantz is a Pennsylvania-based corporation that sells, leases, and services construction equipment, including Wirtgen-branded products. (Doc. No. 18 ¶¶ 15–16.) In 2002, the parties entered into a Distributor Sales and Service Agreement (the "Agreement") under which Elliott & Frantz became a dealer of Wirtgen's products. (Doc. No. 15-1.) By its own account, Elliott & Frantz "was an established distributor of heavy equipment" when the parties' relationship began. (Doc. No. 18 ¶ 2.) The company enjoyed "deep relationships in the Mid-Atlantic construction industry," which Wirtgen "relied on" to establish its presence in the market and "grow Wirtgen's products into market leaders." (*Id.* ¶¶ 2–3.) To date, Elliott & Frantz has invested over $400 million in Wirtgen's various product lines. (*Id.* ¶¶ 1, 51, 78.)

The Agreement authorized Elliott & Frantz to sell, lease, and service certain Wirtgen-branded products within a defined geographic territory. (Doc. No. 18 ¶¶ 39–40.) Over the course of the relationship, the parties have amended the Agreement twice to expand Elliott & Frantz's geographic territory (the "2005 Amendment") and to expand the line of Wirtgen products that Elliott & Frantz distributes (the "2009 Memorandum of Understanding"). (*Id.* ¶¶ 40–45; Doc. Nos. 15-2, 15-3.) At the time the Agreement was entered, Elliott & Frantz's Chief Executive Officer ("CEO") was Jim Elliott. (Doc. No. 18 ¶ 2.)

**B. The Agreement's Relevant Provisions**

Several provisions of the Agreement are relevant to this dispute. First, the Agreement selects the laws of Tennessee to govern its construction, interpretation, and enforcement. (Doc.

No. 15-1 § 9.04.) Second, the Agreement contains a mandatory forum-selection clause providing that "[a]ny action between [Wirtgen] and [Elliott & Frantz] shall be filed either in the United States District Court for the Middle District of Tennessee or in the Chancery Court for Davidson County, Tennessee." (*Id.*)

Third, the Agreement defines the parties' obligations and provides that the parties can terminate the Agreement if certain conditions are met. As relevant here, Section 9.05 provides that "[n]either this Agreement nor any rights or obligations of [Elliott & Frantz] may be sold, *assigned*, delegated or *otherwise transferred* by [Elliott & Frantz], by operation of law or otherwise, without the prior written approval of [Wirtgen]." (*Id.* § 9.05 (emphasis added).) An "assignment" includes "[a]ny merger, consolidation, *transfer of assets*, event or transaction which results (whether by operation of law or otherwise) in a *change of ownership or control* of [Elliott & Frantz] or [Elliott & Frantz's] business." (*Id.* (emphasis added).) Section 5.04(b) grants Wirtgen the right to terminate the Agreement after 30 days' written notice and opportunity to cure in the event that Elliott & Frantz (1) breached "any of the provisions of the Agreement"; (3) experienced "any loss of managers, officers or key employees through termination of employment or otherwise, which in the commercially reasonable judgment of [Wirtgen] may adversely affect the business of [Elliott & Frantz] or [Wirtgen]"; or (6) "assigned this Agreement without [Wirtgen's] prior written consent." (*Id.*, § 5.04(b)(1), (3), (6).)

### C. Wirtgen's Acquisition, Jim Elliott's Illness, and Catherine Elliott's Rise

In 2017, Wirtgen's parent company was acquired by Deere. (Doc. No. 18 ¶¶ 4, 19.) The following year, Jim Elliott was diagnosed with amyotrophic lateral sclerosis ("ALS"), a progressive neurological disorder. (*Id.* ¶ 5.) As Jim's health forced him to step back from in-person leadership of the company, Catherine Elliott—Jim's daughter and an employee of Elliott & Frantz

since 2011—assumed greater leadership responsibilities within the firm. (*Id.* ¶¶ 4, 6.) Catherine was ultimately elevated to the role of Chief Operating Officer ("COO") during the same year of Jim's diagnosis. (*Id.* ¶ 6.)

As the plaintiffs tell it, the transition from Jim to Catherine in the control and management of Elliott & Frantz was "unmistakably visible." (Doc. No. 74-1 ¶ 7.) Over the last five years, Catherine has "worked closely with Wirtgen" alongside other senior management. (*Id.*) She has regularly interacted with Wirtgen's senior management "concerning strategy and objectives," placed orders with the supplier's sales team, and attended "Wirtgen's sales meetings and dealer principal meetings." (*Id.* ¶ 63.) Wirtgen has also identified Catherine as a "Dealer Principal" on formal company documents and lumped her in with Wirtgen's other distributors on external-facing communications: "[a]s early as 2019, Wirtgen listed Catherine on documents as a 'Dealer Principal' and, since that time, has included Catherine on communications directed to dealer principals." (*Id.* ¶ 65.)

In 2022, Elliott & Frantz celebrated 60 years in business by placing a "supplement" in "an industry periodical familiar to Wirtgen." (*Id.* ¶ 68.) The supplement included an advertisement sponsored by Wirtgen that congratulated Elliott & Frantz on its sixtieth anniversary. (*Id.*) The Wirtgen-sponsored advertisement appeared alongside an article—titled "Poised to Carry On Her Father's Legacy"—highlighting Catherine's growing leadership role within the company and describing her "inexorabl[e]" move "towards the CEO position." (*Id.*)

On August 5, 2024, Jim Elliott emailed Wirtgen's CEO and President, James McEvoy. In relevant part, Jim wrote:

> In 2022, we discussed that Catherine had been running the company for 2 years and things had been going well. You said I should be very proud. I am even prouder of her now because she has spent 4 years running the company and is doing great. Our market share is up with all of our manufacturers. She loves Wirtgen and Wirtgen is now almost 50% of

> our business. She is currently in the process of hiring two more Wirtgen/Kleemann specialists.

(Doc. 66-2 at 2.) Almost two months later, McEvoy responded to Jim's email with a formal letter. (Doc. No. 66-3). In the letter, McEvoy did not dispute Jim's characterization "that Catherine had been running the company" for years. Rather, McEvoy acknowledged that Jim's email "suggests that substantial changes in ownership, management, and control may be on the horizon at Elliott & Frantz." (Doc. No. 66-3). Citing various provisions of the Agreement, McEvoy noted that Elliott & Frantz must obtain the prior written approval of Wirtgen for any change in the ownership or control of Elliott & Frantz and that Wirtgen had the right to terminate the Agreement in the event of a change in ownership or control to which Wirtgen does not consent. (*Id*. at 2.) McEvoy requested that the company disclose any past or contemplated changes in ownership, management, or control. (*Id*. at 2.)

Jim later replied with his own letter, stating that he continued to maintain ownership and control over Elliott and Frantz as the company's CEO, "Chairman of the Board of Directors, which has only one director—me," and the company's controlling shareholder. (Doc. No. 66-4 at 2–3.) However, as Jim's disease progressed, Catherine was "taking on increasing responsibilities." (*Id*. at 2.) She currently served as the COO and was "becoming the internal and external face of the company." (*Id*.) Jim planned for her to succeed him as the CEO at some future date. (*Id*.) In his letter, Jim also disclosed that he had "contributed a portion" of his ownership in Elliott & Frantz to a trust created in 2019 and that he intended "to transition ownership of Elliott & Frantz for the benefit of" his wife and Catherine "as and when appropriate." (*Id*.) The portion of his ownership that he contributed to the trust represented a 21.38% ownership interest in the company and consisted exclusively of non-voting shares. (*Id*. at 3.)

In January 2025, McEvoy sent another letter to Jim. (Doc. No. 66-7.) First, McEvoy noted that Wirtgen was "unaware" of Jim's earlier transfer of a portion of his ownership in Elliott & Frantz to the trust and thus "was not given the opportunity to review and approve these changes as required by Sections 9.05 and 5.04" of the Agreement. (*Id.* at 2.) In Wirtgen's opinion, these changes constituted a breach of Sections 9.05 and 5.04 of the Agreement, thereby giving Wirtgen the right to terminate the Agreement absent a satisfactory cure. (*Id.*) Second, McEvoy further conveyed that Wirtgen would not consent to Catherine's succeeding Jim as Elliott & Frantz's CEO. (*Id.* at 2–3.) McEvoy's reasoning was non-specific, writing only that Wirtgen harbored "concerns about Catherine taking over the business" because "she has not been as engaged in the business as you were." (*Id.* at 3.)

McEvoy also shared that termination of the Agreement would serve Wirtgen's "interest" because it would allow the company to "align" its "dealer network with that of John Deere & Co., which now owns the Wirtgen Group." (*Id.*) Signing off, McEvoy relayed Wirtgen's appreciation for "the relationship it has had with Elliott & Frantz" for over 20 years, but nevertheless "believe[s] that the time is close at hand to allow each of our companies to pursue its business objectives separately." (*Id.* at 4; *see also* Doc. No. 60 ¶ 86 ("Wirtgen believes that now is the right time to end its relationship with Elliott & Frantz, which can no longer effectively serve Wirtgen's business needs for many reasons, including in part because of Wirtgen's acquisition by John Deere & Co. ('Deere') in 2017.").) Weeks later, Jim Elliott passed away. (Doc. No. 18 ¶ 17.)

## II. PROCEDURAL HISTORY

### A. The New Jersey State Court Action, Removal to the District Court in New Jersey, and Transfer to this Court

The plaintiffs originally filed this lawsuit in the Superior Court of New Jersey in February 2025. Wirtgen removed the case to the United States District Court for the District of New Jersey

under 28 U.S.C. § 1441(a) based on diversity grounds. (Doc. No. 1 ¶¶ 8–11.) After removal, the plaintiffs filed the First Amended Complaint, asserting seven claims for declaratory and injunctive relief to prevent Wirtgen from terminating the Agreement. (Doc. No. 18.)

Wirtgen then filed a motion seeking transfer of the case from the district court in New Jersey to this court based on the Agreement's mandatory forum-selection clause. (Doc. No. 15 § 9.04.) The plaintiffs opposed the transfer motion, arguing that the New Jersey Franchise Practices Act ("NJFPA") prohibited a franchisor from enforcing such a venue provision. (Doc. No. 42.) In December 2025, the district court in New Jersey granted Wirtgen's motion, ruling that the NJFPA did not apply because Elliott & Frantz failed to meet the minimum jurisdictional requirements under the statute. (Doc. No. 58-1 at 14:20–22.)

**B. The Two Pending Motions in this Case**

Following transfer to this court, Wirtgen filed an answer denying the material allegations asserted in the First Amended Complaint. (Doc. No. 60.) Wirtgen also asserted a single counterclaim seeking a declaration that it has the right to terminate the Agreement under the terms of the Agreement and under applicable Tennessee law. (Doc. No. 60 ¶¶ 104–118.) The plaintiffs have filed an Answer in response to Wirtgen's counterclaim. (Doc. No. 67.)

Wirtgen has filed a Motion for Judgment on the Pleadings under Federal Rule of Civil Procedure 12(c) (Doc. No. 68.), asking this court to declare that Wirtgen has the contractual and statutory "good cause" right under Tennessee law to terminate the Agreement based on Jim Elliott's death. (*Id*. at 6, 12–16.) Wirtgen also seeks dismissal of all seven claims asserted by the plaintiffs in the First Amended Complaint on the grounds that those claims fail as a matter of law. (*Id*.)

On their response deadline, the plaintiffs filed a four-page Response in Opposition to Wirtgen's Motion for Judgment on the Pleadings that failed to address any of the arguments raised in Wirtgen's motion. (Doc. No. 73.) Instead, the plaintiffs directed the court's attention to a different motion—a Motion for Leave to File a Second Amended Complaint (Doc. No. 72)—that the plaintiffs filed alongside their four-page response to Wirtgen's pending motion. Wirtgen opposes the plaintiffs' pending motion to amend on futility grounds. (Doc. No. 74.)

## III. LEGAL STANDARDS

### A. Motion for Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards that govern a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Reilly v. Vadlamudi*, 680 F.3d 617, 622–23 (6th Cir. 2012). In ruling upon such a motion, the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Eye Centers of Am., LLC v. Series Protected Cell 1*, 583 F. Supp. 3d 1105, 1112–13 (M.D. Tenn. 2022), *aff'd sub nom. Eye Centers of Am., LLC v. Series Protected Cell 1, a Series of Oxford Ins. Co. TN, LLC*, No. 22-5138, 2022 WL 13983763 (6th Cir. Oct. 24, 2022).

However, the court "need not accept the plaintiff's legal conclusions or unwarranted factual inferences as true." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007). To survive a Rule 12(c) motion, the complaint's allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish "facial plausibility," and thus "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action" but

instead must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). When reviewing a motion for judgment on the pleadings under Rule 12(c), "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint" may also be considered by the court. *Amini v. Oberlin Coll.,* 259 F.3d 493, 502 (6th Cir. 2001) (quoting *Nieman v. NLO, Inc.,* 108 F.3d 1546, 1554 (6th Cir.1997)) (emphasis omitted).

**B. Motion to Amend Pleading**

Federal Rule of Civil Procedure 15(a)(1) permits a party to amend its pleading "once as a matter of course" within "(A) twenty-one days after serving it; or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1)(A)–(B). Otherwise, once that window is closed, Rule 15(a)(2) allows a party to amend its pleading only with the opposing party's consent or by leave of court. Rule 15(a)(2) adds that a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Nonetheless, a motion for leave to amend may be denied "if the amendment would be futile." *Grand Traverse Band of Ottawa & Chippewa Indians v. Blue Cross Blue Shield*, 146 F.4th 496, 515 (6th Cir. 2025). "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010) (quoting *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000)). The party opposing a motion to amend has the burden of establishing futility. *Spann v. Tenn. Dep't of Corr.*, No. 1:25-cv-00005, 2025 WL 1680014, at *5 (M.D. Tenn. June 13, 2025) (citation omitted).

## IV. DISCUSSION

### A. Choice of Law

Jurisdiction exists in this court due to the diversity of citizenship between the parties. (Doc. No. 18 ¶¶ 15, 18–19.) The law at issue is state law, but the parties disagree on which state's laws apply. The plaintiffs argue that the laws of multiple other states apply. (Doc. No. 18 ¶¶ 88–97, 104–11, 112–19, 120–29.) On the other hand, Wirtgen argues that Tennessee law applies based on the unambiguous choice-of-law provision set forth in the Agreement. (Doc. No. 68 at 12–13.) In Wirtgen's view, "the parties reasonably selected the law of a single jurisdiction—Tennessee—to govern their relationship," given that Wirtgen is headquartered in Tennessee and Elliott & Frantz's geographic territory for Wirtgen products covers multiple states. (*Id*. at 18.) "To avoid potentially conflicting obligations and to ensure a uniform law to govern their relationship, it was entirely reasonable for the Agreement to select the law of a single jurisdiction—Tennessee, where Wirtgen is located—to govern these sophisticated parties' relationship." (*Id*.) For the following reasons, the court concludes that Tennessee law applies to the parties' Agreement.

Typically, "[a] federal court exercising diversity jurisdiction applies the choice-of-law rules of the state in which it sits." *Doe v. Etihad Airways, P.J.S.C.*, 870 F.3d 406, 435 (6th Cir. 2017). Under Tennessee's choice-of-law rules, courts apply the parties' contractually selected law if four conditions are met. *Williams v. Smith*, 465 S.W.3d 150, 153-57 (Tenn. Ct. App. 2014). Those four conditions require that (1) the choice of law provision was executed in good faith; (2) the chosen jurisdiction must bear a material connection to the transaction; (3) the basis for the jurisdiction must be reasonable and not a sham; and, (4) the choice of the jurisdiction must not be contrary to the fundamental policy of a state having a materially greater interest and whose law would otherwise govern." *Wirtgen Am., Inc. v. Hayden-Murphy Equip. Co.*, No. 3:22-cv-00308, 2023 WL 123499, at *5 (M.D. Tenn. Jan. 6, 2023).

Here, the first three requirements are easily met. There is no basis for concluding that the choice-of-law provision was adopted in bad faith. Although the plaintiffs complain that the forum-selection and choice-of-law provisions were presented by Wirtgen on a "take-it-or-leave-it" basis without negotiation (Doc. No. 18 ¶¶ 29–33), federal courts routinely uphold such provisions, even in situations involving adhesion contracts. *See, e.g.*, *Wise v. Zwicker & Assocs.*, 780 F.3d 710, 715 (6th Cir. 2015) (observing that Ohio law enforces choice-of-law provisions even in an adhesion contract); *Anderson v. Amazon.com, Inc.*, 478 F. Supp. 3d 683, 699 (M.D. Tenn. 2020) (enforcing arbitration clause in parties' contract, despite consumer's frustration with "boilerplate language that now seems like a contract of adhesion that the consumer now seeks to avoid").

Regardless, the court is not persuaded by Elliott & Frantz's suggestion that the choice-of-law provision should be set aside because the company lacked sufficient bargaining power. By its own admission, Elliott & Frantz was "a unified multi-state franchise" and "an established distributor of heavy equipment with deep relationships in the Mid-Atlantic construction industry" when it entered the Agreement. (Doc. No. 18 ¶¶ 1–2, 11.) "Wirtgen relied on Elliott & Frantz to develop Wirtgen's presence in the region and, over many years, to grow Wirtgen's products into market leaders," which "benefitted both Elliott & Frantz and Wirtgen." (*Id.* ¶ 3.) Whatever gloss Elliott & Frantz wants to place on the lack of negotiation over the forum-selection and choice of law provisions, its arguments do not change the fact that the company is a sophisticated actor with industry expertise. *See Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 326 (3d Cir. 2006) (concluding that Elliott & Frantz was not a "weak entity" that lacked bargaining power, given "its own representation" as a "top-notch distributor of industrial and construction equipment" (internal quotation marks omitted)).

Likewise, Tennessee has at least some material, non-sham connection to the Agreement because Wirtgen is incorporated and headquartered in the state. *Hayden-Murphy Equip. Co.*, 2023 WL 123499, at *5. Thus, the only remaining question is whether applying Tennessee law would be contrary to a "fundamental" public policy of New Jersey, Maryland, or Virginia (the states' laws underlying Counts 1, 4, 6, and 7). This last question requires considering (i) whether these other states' laws would "otherwise govern" the Agreement; and (ii) if so, whether these three other states have a greater interest in the parties' relationship than Tennessee. *Id*. at *5.

**i. Count 1**

The court finds the choice of law analysis as to the claims arising under New Jersey law is relatively straightforward. (*Id*. ¶¶ 88–97, 127–29.) Count 1 is a claim under the NJFPA, N.J.S.A. § 56:10-1 *et seq.* (Doc. 18 ¶¶ 88-97.) As Wirtgen points out, "the District Court in New Jersey has already ruled that 'the NJFPA does not apply to the dealer agreement between the parties' and transferred the case to this court on that basis." (Doc. No. 68 at 20 (quoting Doc. No. 58-1 at 14).) This court agrees. Finding that Elliott & Frantz is not entitled to relief under the NJFPA, the court declines to apply New Jersey law and dismisses this claim. *Hayden-Murphy Equip. Co.*, 2023 WL 123499, at *8 (M.D. Tenn. Jan. 6, 2023) (acknowledging that a particular state's laws can make a choice of law clause void only "if that particular state's law applies to the matter before the Court in the first place.") (citation and internal quotation marks omitted).

The NJFPA applies only "to a franchise [agreement] (1) the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey," among other statutory requirements. *See* N.J.S.A. § 56:10-4(a). A "place of business" is defined as:

> [A] fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods or offers for sale and sells the franchisor's services. Place of business

> shall not mean an office, a warehouse, a place of storage, a residence or a vehicle, except that with respect to persons who do not make a majority of their sales directly to consumers, 'place of business' means a fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods or offers for sale and sells the franchisor's services, or an office or a warehouse from which franchisee personnel visit or call upon customers or from which the franchisor's goods are delivered to customers."

N.J. Stat. Ann. § 56:10-3(f). Courts in New Jersey have further clarified the contours of the place of business requirement. To meet this jurisdictional predicate, a franchisee must maintain "an actual sales location in New Jersey," where "a *substantial* level of customer marketing and 'sales-related [customer] interplay' occurs, not solely a center of distribution." *Ocean City Exp. Co. v. Atlas Van Lines, Inc.*, 46 F. Supp. 3d 503, 509 (D.N.J. 2014) (internal quotation marks omitted) (emphasis added). By contrast, this requirement is not met when the allegations in the complaint reflect only a "scant level of activity" amounting to "[m]ere distribution through an office." *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 349, 614 A.2d 124, 137 (1992).

Elliott & Frantz gives few details about its New Jersey operations. The First Amended Complaint notes that the company maintains two locations in New Jersey. (Doc. No. 18 ¶¶ 15–16.) The first location—in Clayton—was opened in May 2023 and is used by William McLoughlin, the company's vice president, "at least one a month" to support sales activities in South Jersey. (Doc. No. 42-4 ¶ 30.) The other location is in Wall Township. (Doc. No. 18 ¶ 15.) This office was opened in February 2025—*after* Wirtgen placed Elliott & Frantz on notice that the contemplated changes in ownership and management at the company would result in termination of the Agreement and only days *before* the plaintiffs filed their original Complaint in New Jersey state court. (Doc. No. 42-2 ¶ 22.) Michael Delia, a company sales representative for only six months before this dispute arose, maintains "a desk with a computer and a telephone line" at this

office. (*Id*. ¶¶ 2, 14, 22–23.) Delia is "present at the Wall Township Location" in between "customer meetings in the field." (*Id*. ¶ 24.)

Taken together, these allegations fail to plausibly allege that the New Jersey locations qualify as "places of business" under the NJFPA. First, the allegations surrounding the Clayton location do not meet this requirement. As the District Court in New Jersey concluded, "there are no factual disputes that the Clayton, New Jersey location is not a place of business under the NJFPA." (Doc. No. 58-1 at 10:10–11.) That is because McLoughlin's activities at this location, accepted as true, reflect only a "scant level of activity" rather than "major activity." (*Id*. at 10:14–15.) The NJFPA requires more than allegations of "minuscule on-site sales activity" to meet the "place of business" requirement. *Fischer Thompson Beverages, Inc. v. Energy Brands Inc.*, 2007 WL 3349746, at *4 (D.N.J. Nov. 9, 2007).

The allegations surrounding the Wall Township location also cannot satisfy the NJFPA's "place of business" requirement. Elliott & Frantz admits to opening this location in February 2025 after McEvoy threatened termination of the Agreement in his January 2025 letter. (Doc. No. 42-2 ¶ 22; Doc. No. 58-1 at 10:18–25—11:1–4.) This location—established to "manufacture an after-the-fact application of the NJFPA by establishing a 'place of business'" in the state—was not contemplated by the parties throughout the entirety of their relationship and was only opened after "the very existence of the relationship between the parties was already in dispute." (Doc. No. 58-1 at 10:25—11: 7–8.) On this record, the court cannot conclude that the parties anticipated that Elliott & Frantz would "set up a bricks and mortar location" in Wall Township and "thus signal[] that they 'contemplated' this course of action." *Strassle v. Bimbo Foods Bakeries Distrib., Inc.*, No. 12–3313 (RBK/AMD), 2013 WL 1007289, at *3 (D.N.J. Mar. 13, 2013) (quoting N.J. Stat. Ann. § 56:10-4(a)).

For these reasons, the court concludes that Elliott & Frantz's claim under the NJFPA fails as a matter of law because the company cannot demonstrate that it meets the minimum jurisdictional requirements to assert a claim under the NJFPA. As Elliott & Frantz cannot state a legally cognizable claim, the court further finds that applying Tennessee law instead of New Jersey law would not violate any "fundamental" public policy of New Jersey, or that New Jersey maintains "a materially greater interest" in having its law applied under the circumstances. Wirtgen's motion as to Count 1 of the First Amended Complaint will be granted, and the claim will be dismissed.

The court also notes that the plaintiffs seek to reassert this claim through their proposed Second Amended Complaint. (Doc. No. 72-1 ¶¶ 95–106.) A review of the redline version of that proposed amended pleading, however, does not reveal any new substantive allegations to support the claim. (Doc. No. 74-1 ¶¶ 95–106.) In fact, the allegations in the proposed Second Amended Complaint are almost identical to the deficient allegations that compel dismissal of this claim in the First Amended Complaint. Elliott & Frantz does not add any new factual material about the sales activity occurring at these two offices or, for that matter, whether any specific sales of Wirtgen-branded products took place at either of these two offices. (Doc. No. 74-1.) For these reasons, the plaintiffs' Motion for Leave to File a Second Amended Complaint as to Count 1 will be denied on futility grounds, given that the claim, as pled, fails as a matter of law, and the proposed amended pleading does not add any new allegations addressing the pleading defects.

**ii. Count 7**

Count 7 is a claim for injunctive relief under the New Jersey Law Against Discrimination ("NJLAD") asserted by Jim and Catherine Elliott as individuals. (Doc. No. 18 ¶¶ 127–29.) After Wirtgen filed its motion, the plaintiffs represented in both their amendment request and response

brief that this claim is withdrawn as to Jim Elliott in light of his death. (Doc. Nos. 72 at 9; 73 at 1.) Count 7 will therefore be dismissed as to Jim Elliott and Wirtgen's motion will be denied as moot as to this portion of the claim.

However, Catherine Elliott's claim under the NJLAD also cannot withstand dismissal. The NJLAD protects against various forms of discrimination, including gender discrimination. N.J. Stat. Ann. § 10:5-12(l). To state a claim under the NJLAD, the plaintiff must raise specific factual allegations rather than unsupported legal conclusions. *Saqa v. Factory Mut. Ins. Co.*, No. 23-3994 (SDW) (JBC), 2024 WL 939689, at *4 (D.N.J. Mar. 5, 2024); *Castelli v. Am. Red Cross*, No. 23-1198 (ES) (AME), 2026 WL 1906923, at *3 (D.N.J. July 2, 2026); *Adams-Buffaloe v. State-Operated Sch. Dist. of the City of Camden*, No. 18-17122 (RBK/AMD), 2020 WL 6055152, at *5 (D.N.J. Oct. 14, 2020).

The thrust of Catherine's claim under the NJLAD is that Wirtgen seeks to terminate its Agreement with Elliott & Frantz based on Catherine's gender. (Doc. No. 18 ¶¶ 128–29.) The problem, however, is that the First Amended Complaint contains no factual allegations plausibly suggesting that Wirtgen was motivated by Catherine's gender when seeking to terminate the Agreement. The allegations are conclusory, alleging that Wirtgen's threatened termination was "impermissibly based on . . . Catherine's gender and violate NJLAD." (Doc. No. 18 ¶ 129; *see also id*. ¶ 12 ("New Jersey's Law Against Discrimination prohibited Wirtgen from discriminating against . . . Catherine Elliott because of her gender.").) That lone, conclusory statement without any accompanying factual content does not state a claim for gender discrimination under the NJLAD. As Catherine Elliott cannot seek relief under New Jersey law based on her accusations of discrimination, the court finds that applying Tennessee law rather than New Jersey law does not contravene a fundamental public policy of New Jersey or that New Jersey has a greater interest in

having its laws applied to this dispute. Accordingly, Wirtgen's motion will be granted as to the remaining portion of Count 7 and this claim will be dismissed.

Further, the plaintiffs' motion for leave to reassert Count 7 in their proposed Second Amended Complaint will be denied as futile. As with Count 1, the proposed amended allegations underlying Count 7 do not address the pleading defects discussed above. Likewise, Jim and Catherine Elliott's request to assert a similar antidiscrimination claim under the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq*., will be denied. (Doc. No. 72-1 ¶¶ 146–48.) That claim relies on the assertion that "Wirtgen's threatened termination" of the Agreement "and refusal to consent to Jim's planned succession to Catherine" was "impermissibly based on Jim's age and disability and Catherine's gender." (*Id*. ¶ 148). These are the same deficient allegations that led to the dismissal of Count 7 in the First Amended Complaint after one pleading amendment and a proposed Second Amended Complaint that was equally deficient.

**iii. Count 6**

The court will next consider Count 6 asserted by Elliott & Frantz, seeking relief under the Maryland Equipment Dealer Contract Act (the "Maryland Act"), Md. Code Ann., Com. Law § 19-101 *et seq*. (Doc. No. 18 ¶¶ 120–26.) Although pled in the alternative, Elliott & Frantz asserts that the Maryland Act prohibits Wirtgen from terminating the Agreement absent "good cause" and compliance with statutory notice requirements, that Wirtgen does not have statutory "good cause" to terminate the Agreement, and that "Wirtgen's refusal to consent to Jim's proposed transfer to Catherine violates" the Maryland Act. (Doc. No. 18 ¶¶ 12, 115, 118.)

In its motion, Wirtgen argues that Count 6 should be dismissed under Tennessee's choice-of-law rules because applying Tennessee law would not violate any fundamental policy of Maryland. (Doc. No. 68 at 22.) For support, Wirtgen points out that the Maryland statute, like its

Tennessee counterpart, protects dealers from termination without "good cause," Md. Code Ann., Com. Law § 19-103(a), "and provides that good cause exists *per se* when 'a person with a substantial interest in the ownership or control of the dealership, including an individual proprietor, partner, or major shareholder, withdraws from the dealership or dies." (Doc. No. 68 at 22 (quoting Md. Code Ann., Com. Law § 19-102(11).) Thus, there is "no relevant difference between Tennessee and Maryland law, and certainly no difference that would render application of Tennessee law contrary to a fundamental policy of Maryland. (*Id.*) Of course, Wirtgen's argument requires "ascertaining whether there is a material difference between the laws of the relevant states." *Hayden-Murphy Equip. Co.*, 2023 WL 123499, at *5; *see also Lemons v. Cloer*, 206 S.W.3d 60, 64–65 (Tenn. Ct. App. 2006) (citing *Hataway v. McKinley*, 830 S.W.2d 53, 55 (Tenn. 1992)).

In this instance, Tennessee law would examine the termination of the Agreement under the state's dealer statute. Tenn. Code Ann. § 47-25-1302. In relevant part, that statute provides:

> (a) No supplier, directly or through an officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a retail agreement without good cause. "Good cause" means failure by a retailer to comply with requirements imposed upon the retailer by the retail agreement if such requirements are not different from those imposed on other retailers similarly situated in this state. In addition, good cause exists whenever: . . .
>
>> (6) The retailer transfers an interest in the dealership, or a person with a substantial interest in the ownership or control of the dealership, including an individual proprietor, partner or major shareholder, withdraws from the dealership or dies, or a substantial reduction occurs in the interest of a partner or major shareholder in the dealership. However, good cause does not exist if the supplier consents to an action described in this subsection (a).
>
> (b) Except as otherwise provided herein, a supplier shall provide a retailer with at least ninety (90) days' written notice of termination, cancellation or nonrenewal of the retail agreement and a sixty-day right to cure the deficiency. If the deficiency is cured within the allotted time, the notice is void. . . . The notice shall state all

> reasons constituting good cause for action. The notice is not required if the reason for termination, cancellation or nonrenewal is a violation under subsection (a).

*Id.* § 47-25-1302(a)(6), (b).

Unfortunately, Elliott & Frantz did not address Wirtgen's arguments regarding any actual conflicts between Tennessee and Maryland law in its four-page response brief. (*See, e.g.*, Doc. No. 73.) Although "the court might be able to end its choice-of-law analysis there," given Elliott & Frantz's failure "to identify any specific choice that must be made," the court will nevertheless proceed "with its analysis in the interest of establishing which state's statute should govern this dispute." *Hayden-Murphy Equip. Co.*, 2023 WL 123499, at *7.

The court's own review demonstrates that the two statutes afford dealers of heavy equipment with the same level of protection against termination under these circumstances. For example, both statutes apply to a supplier's decision to "terminate, cancel, fail to renew or substantially change" the parties' contractual relationship. Tenn. Code Ann. § 47-25-1302(a); Md. Code Ann., Com. Law § 19-103(a). Both statutes also impose a "good cause" requirement for termination and provide that good cause exists based on the departure of "an individual proprietor, partner or major shareholder" of the distributor without the supplier's consent. Tenn. Code Ann. § 47-25-1302(a); Md. Code Ann., Com. Law § 19-103(a). The notice-and-cure requirements for termination are identical: neither statute requires the supplier to provide notice and an opportunity to cure to a dealer in the event of a termination for "good cause." Tenn. Code Ann. § 47-25-1302(b); Md. Code Ann., Com. Law § 19-103(b)(2).

In short, the court perceives no material difference between the Tennessee and Maryland statutes that would render application of Tennessee law contrary to a fundamental policy of Maryland based on the allegations in this case. In the absence of any disjunction between the two states' laws, the court will honor the parties' Agreement that a court hearing a dispute between

them under the Agreement should apply the laws of the state of Tennessee. Accordingly, Wirtgen's motion as to Count 6 in the First Amended Complaint will be granted**,** and the claim arising under the Maryland Equipment Dealer Act will be dismissed. (Doc. No. 18 ¶¶ 120–26.) Elliott & Frantz's request to reassert this claim in its proposed Second Amended Complaint will be denied as futile.

**iv. Counts 4 and 5**

Count 4 is a claim under the Virginia Heavy Equipment Dealer Act, Va. Code Ann. § 59.1-353 *et seq*. (the "Virginia Act"). (Doc. No. 18 ¶¶ 104–11.) The Virginia Act regulates the relationship between suppliers and dealers of heavy equipment. A "dealer" is defined as "a person in Virginia (i) engaged in the business of selling or leasing heavy equipment at retail, (ii) who customarily maintains a total inventory, valued at over $250,000, of new heavy equipment and attachments and repair parts therefor, and (iii) who provides repair services for the heavy equipment sold." Va. Code Ann. § 59.1-353. No doubt, Elliott & Frantz invokes the Virginia Act because the statute prohibits contractual restrictions on the transfer of a dealer's business "to a member or members of the family of the dealer or the principal owner of the dealer." § 59.1-356(B).

In its motion, Wirtgen seeks dismissal of Count 4, arguing that Elliott & Frantz fails to plead facts sufficient to establish that the company meets the jurisdictional requirements of the Virginia Act. (Doc. No. 68 at 22–23.) Specifically, Wirtgen argues that Elliott & Frantz is not a "dealer" under the Virginia Act because the company is not "a person in Virginia" and does not allege that it regularly stocks $250,000 of inventory in Virginia. (*Id.*) For its first argument, Wirtgen contends that Elliott & Frantz cannot be a "person in Virginia" under the Virginia Act because the company "is a Pennsylvania corporation with its principal place of business in Pennsylvania." (*Id.* at 22 (citation and quotation marks omitted.) Wirtgen does not identify any

authority establishing that the Virginia Act only covers Virginia-based corporations. For its second argument, Wirtgen argues that the First Amended Complaint "fails to assert any facts plausibly alleging that Elliott & Frantz regularly stocks $250,000 of inventory *in Virginia*." (*Id*. at 22–23 (emphasis in the original).)

Attempting to salvage this claim, Elliott & Frantz's proposed Second Amended Complaint adds a single, new allegation that the company "has a Virginia location where it customarily maintains a total Wirtgen inventory valued at over $250,000 of new heavy equipment and parts." (Doc. No. 74-1 ¶ 115.) Although Elliott & Frantz listed the addresses for its New Jersey locations, the Virginia location remains a mystery. (Doc. Nos. 18 ¶ 115; 74-1 ¶ 16.)

In any event, the allegations in both the First Amended Complaint and the proposed Second Amended Complaint are devoid of specific factual content that would support an inference that the Virginia Act applies. Although Elliott & Frantz recites the Virginia Act's minimum jurisdictional requirements, neither the First Amended Complaint nor the proposed Second Amended Complaint asserts specific factual allegations that would establish these legal requirements. For example, Elliott & Frantz does not identify what, if any, Wirtgen-branded products are customarily maintained in Virginia, the number of units regularly stocked in the state, or the value of those products. Ignoring specifics, the company asserts only that the inventory maintained in Virginia "easily" exceeds the Virginia Act's threshold amount, given "the value of even one Wirtgen machine, which often exceeds $250,000." (Doc. No. 74-1 ¶ 115.) The court is not as "easily" convinced. For instance, William McLoughlin—the vice president of Elliott & Frantz and a veteran of the company since 1979—represented in a declaration accompanying the plaintiffs' opposition to Wirtgen's transfer motion that Wirtgen products start in the "tens of thousands of dollars for smaller units." (Doc. No. 42-4 ¶¶ 2, 24.) Do the products stocked in

Virginia consist of these lower cost units? If so, how many of these units are maintained in Virginia? Does the value of these units exceed $250,000? Are they "customarily" maintained in Virginia or in other facilities maintained by Elliott & Frantz? Based on the allegations in the First Amended Complaint and proposed Second Amended Complaint, the court cannot say.

In sum, the current allegations do not come close to establishing that Virginia law should supplant the laws of the state of Tennessee. The lone conclusory assertion slapped onto the proposed Second Amended Complaint's version of Count 4 cannot rescue this claim from dismissal. Consequently, Wirtgen's motion will be granted as to Count 4, and the claim will be dismissed. The plaintiffs' motion to amend its pleading will be denied as to Count 4 on futility grounds.

Count 5 is asserted by Elliott & Frantz under the Delaware Franchise Security Law, Del. Code Ann. tit. 6, § 2551 *et seq.* (Doc. No. 18 ¶¶ 112–19.) After Wirtgen filed its motion, Elliott & Frantz withdrew this claim. (Doc. No. 72 at 8.) Count 5 will therefore be dismissed, and Wirtgen's motion will be denied as moot as to this claim.

To summarize, the court will honor the parties' Agreement and apply the laws of Tennessee rather than the laws of New Jersey, Maryland, and Virginia. Wirtgen's motion as to Counts 1, 4, 5, 6, and 7 in the First Amended Complaint will be granted, and these counts will be dismissed from the case. The court will deny the plaintiffs' Motion for Leave to File a Second Amended Complaint as to these five claims on futility grounds because the new allegations in the proposed amended pleading would not save these claims from dismissal.

**B. Counts 2 and 3**

Counts 2 and 3 of the First Amended Complaint will also be dismissed. Under Count 2, Elliott & Frantz purports to enforce its "common law franchise rights." (Doc. No. 18 ¶¶ 98–100.)

Elliott & Frantz alleges that "Wirtgen's threat to terminate and refusal to consent to Jim's proposed transfer to Catherine is without good cause, against public policy and unconscionable." (*Id.* 18 ¶ 100.) The company does not specify under which state's common-law this claim is asserted. To the extent this claim is asserted under Tennessee law, the claim fails because Elliott & Frantz has not presented any authority suggesting that Tennessee recognizes a common-law right against termination of a franchise. In fact, the court takes notice that termination protections for Tennessee franchisees, including dealers of heavy construction equipment, are statutory in nature. *See, e.g.*, Tenn. Code Ann. §§ 47-25-1301through -1302 (protecting dealers of construction, utility, and industrial equipment from termination). Count 2 also fails to the extent it relies on the common law of a different state. As made clear in the court's analysis of Counts 1, 4, 6, and 7, Tennessee law applies to this dispute based on the Agreement's choice of law provision.

Count 3 asserts a claim for breach of the implied covenant of good faith and fair dealing. (Doc. No. 18 ¶¶ 101–03.) According to Elliott & Frantz, Wirtgen has an obligation under the implied covenant to "exercise its discretion under the parties' agreement in good faith." (*Id.* ¶ 102.) Wirtgen allegedly breached that obligation when it threatened to terminate the Agreement and refused "to consent to Jim's transfer to Catherine." (*Id.* ¶ 103.)

In Tennessee, the duty imposed by the implied covenant of good faith and fair dealing is "famously narrow." *Hayden-Murphy Equip. Co.*, 2024 WL 1661125, at *15. The implied covenant "creates a duty to provide basic fairness" by protecting contracting parties' "reasonable expectations as well as their rights to receive the benefits of their agreement." *Walton v. Interstate Warehousing, Inc.*, No. 3:17-cv-1324, 2020 WL 1640440, at *9 (M.D. Tenn. Apr. 2, 2020) (Richardson, J.). The basic idea is that "one party cannot in bad faith get in the way of the

counterparty's satisfaction of a contract condition that would result in the counterparty's realization of a benefit under the contract." *Id*.

It is well settled that the implied covenant does not serve as an independent basis for relief separable from the terms of the parties' contract. *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 666 (Tenn. 2013); *Doe v. Univ. of the South*, No. 4:09-cv-62, 2011 WL 1258104, at *18 (E.D. Tenn. Mar. 31, 2011) (quoting *Lyons v. Farmers Ins. Exch.*, 26 S.W.3d 888, 894 (Tenn. Ct. App. 2000) (breach of the duty of good faith and fair dealing "is not a cause of action in and of itself but [is] a part of a breach of contract cause of action.")). However, "it is a mistake to assume" that the implied covenant does not impose a "distinct duty," even though it does not create new contractual rights or obligations. *Allen v. Middle Tenn. Sch. of Anesthesia, Inc.*, No. 3:20-cv-00903, 2022 WL 10551094, at *12 (M.D. Tenn. Oct. 18, 2022). "What the implied covenant of good faith and fair dealing provides is a distinct rationale for recovering under a contract based not on the literal violation of a contractual term but on a party's failure to perform its contractual obligations reasonably and in good faith." *Id*.

Based on the allegations in the First Amended Complaint, Elliott & Frantz has not stated a viable claim for breach of the implied covenant. The crux of the claim is that Wirtgen acted in bad faith when it refused "to consent to Jim's proposed transfer to Catherine." (Doc. No. 18 ¶ 103.) In scrutinizing this claim, the court has struggled to understand the reference to the "proposed transfer" in the First Amended Complaint. Does this reference relate to the transition in *control* from Jim to Catherine, which plaintiffs allege was made with Wirtgen's "knowledge" and "consent" and thus Wirtgen waived its right to object based on the lack of "prior written approval"? (*Id*. ¶¶ 43, 77; Doc. No. 73 at 2–3.) Or does this reference relate to Jim's transfer of a portion of his *ownership* of the company to the trust he created in 2019 for the benefit of Catherine and Jim's

wife? (*Id*. ¶¶ 73; Doc. No. 66-4.) Given the surrounding allegations, this reference appears to refer to the ownership transfer because, as noted above, the plaintiffs allege elsewhere that Wirtgen gave non-written consent to Catherine's assumption of management control of the company. In any case, the court finds that this vague reference in the substantive allegation underpinning this claim is ultimately irrelevant because the plaintiffs have never alleged that Wirtgen consented to the ownership change effectuated by Jim. Under the Agreement, Wirtgen's prior written consent for such a transaction was required. (Doc. No. 15-1 § 9.05.) The fact that such consent was neither requested nor granted provides Wirtgen with independent grounds to terminate the Agreement. *See* Tenn. Code Ann. § 47-25-1302(a)(6) (statutory "good cause" exists for a supplier to terminate a relationship "whenever . . . [t]he retailer transfers an interest in the dealership, or a person with a substantial interest in the ownership or control of the dealership, including an individual proprietor, partner or major shareholder, withdraws from the dealership or dies, or a substantial reduction occurs in the interest of a partner or major shareholder in the dealership.").

Section 9.05 of the Agreement provides that Elliott & Frantz must obtain Wirtgen's "prior written approval" to effectuate an "assignment." (Doc. No. 15-1 § 9.05.) The term "assignment" is broadly defined to encompass "[a]ny . . . change of ownership or control of" Elliott & Frantz. (*Id*.) Further, Section 5.04(b) grants Wirtgen the right to terminate the Agreement after a notice-and-cure period, in the event that Elliott & Frantz assigned the Agreement without Wirtgen's prior written consent. (*Id*. § 5.04(b)(6).)

Although the allegations in the First Amended Complaint regarding Wirtgen's prior knowledge and consent to Catherine's assumption of management control over the company raises a factual question, there is no dispute surrounding Jim Elliott's equity transfer to the trust. The First Amended Complaint makes no such allegation of Wirtgen's prior knowledge, much less that

it consented to the assignment event. The various letters exchanged between Jim and McEvoy when this dispute arose reinforce the view that Wirtgen was not aware of the assignment event. (Doc. Nos. 66-2 through 66-7.) As McEvoy wrote, Wirtgen "was unaware of these changes in ownership and was not given the opportunity to review and approve these changes." (Doc. No. 66-7 at 1.)

On similar facts, the court in *Hayden-Murphy* dismissed an implied covenant claim that accused Wirtgen of bad faith conduct when it threatened to terminate a dealer agreement after the dealer undertook changes in its ownership that were not consented to by Wirtgen as the agreement required. *Hayden-Murphy Equip. Co.*, 2024 WL 1661125, at *16. There, the court recognized that "[i]t is not bad faith simply to choose to avail oneself of a course of action 'specifically allowed by the dealer agreement.'" *Id.* at *15 (quoting *Town & Country Equip., Inc. v. Deere & Co., Inc.*, 133 F. Supp. 2d 665, 669 (W.D. Tenn. 2000)). The possibility that Wirtgen may have also had "additional motives" to terminate the agreement was irrelevant because "Wirtgen never concealed the fact that it had other reasons why it might wish to end the parties' relationship." *Id.* at *16. What mattered was that the dealer never sought—much less received—Wirtgen's consent to the ownership changes, which supplied a good faith basis to terminate the Agreement under its terms and applicable Tennessee law. So too here. Neither the allegations in the First Amended Complaint nor the evidence in the record suggests that Wirtgen was aware of the ownership changes at Elliott & Frantz until Jim's after-the-fact disclosure in his letter to McEvoy in November 2024. (Doc. No. 66-4.) The absence of any allegations of notice and consent to the ownership changes proves fatal to Elliott & Frantz's implied covenant charge. *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 687 (Tenn. 1996) ("Performance of a contract according to its terms cannot be characterized as bad faith in breach of the duty of good faith and fair dealing.").

The allegations concerning Wirtgen's desire to terminate the Agreement based on Catherine's assumption of management control of the company also cannot support a charge of breaching the implied covenant. (Doc. No. 18 ¶¶ 43, 77.) As discussed above, Wirtgen had other reasons to terminate the parties' relationship, including the undisclosed ownership changes.

### C. Wirtgen's Counterclaim and Elliott & Frantz's Proposed New Claim under Tennessee Law

The only remaining issues that must be addressed are (1) Wirtgen's counterclaim for declaratory relief (Doc. No. 60 ¶¶ 104–18 ("Counterclaim")); and (2) Elliott & Frantz's request to assert a new claim under Tennessee's dealer statute. (Doc. Nos. 72 at 5, 8; 72-1 ¶¶ 123–32.)

In its counterclaim, Wirtgen seeks a declaration that it has the right to terminate the Agreement under the terms of the Agreement and applicable Tennessee law. Wirtgen invokes Sections 5.04(b) and 9.05 as the contractual grounds justifying termination. (Counterclaim ¶ 107.) Further, Wirtgen asserts that Tennessee law permits termination because Wirtgen has "good cause" to terminate the Agreement under Tennessee's dealer statute. (*Id*. ¶¶ 108–09.)

As discussed earlier, Section 9.05 states that "[n]either this Agreement nor any rights or obligations of [Elliott & Frantz] may be sold, assigned, delegated or otherwise transferred by [Elliott & Frantz], by operation of law or otherwise, without the prior written approval of [Wirtgen]." (Doc. No. 15-1 § 9.05.) An "assignment" includes "[a]ny … event or transaction which results (whether by operation of law or otherwise) in a change of ownership or control" of Elliott & Frantz. (*Id*.) Under Section 5.04(b), Wirtgen maintains the right to terminate the Agreement if Elliott & Frantz breached "any of the provisions of the Agreement" or "assigned this Agreement without [Wirtgen's] prior written consent." (*Id*. § 5.04(b)(1), (6).)

Under Tennessee's dealer statute, "[n]o supplier, directly or through an officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive

circumstances of a retail agreement without good cause," even if the parties' contract says otherwise. Tenn. Code Ann. § 47-25-1302(a). The statute provides that "good cause" for termination "exists whenever . . . (6) [t]he retailer *transfers an interest in the dealership*, or *a person with a substantial interest in the ownership or control of the dealership*, including an individual proprietor, partner or *major shareholder*, withdraws from the dealership or *dies*, or a *substantial reduction occurs in the interest of a partner or major shareholder in the dealership*." *Id.* § 47-25-1302(a)(6) (emphasis added).

Wirtgen argues that Jim Elliott's death in March 2025 alone provides grounds for Wirtgen to terminate the Agreement under Sections 5.04(b) and 9.05 of the Agreement because Jim's death "effected a change in 'the present owners and managers' of Elliott & Frantz and 'a change of ownership or control' of Elliott & Frantz." (Doc. No. 68 at 13.) Thus, Jim's death constituted an "assignment" as that term is defined in the Agreement, triggering Wirtgen's termination rights under Sections 5.04(b)(1) and (6). (*Id.*)

Wirtgen also asserts that statutory "good cause" exists to terminate the Agreement because Tennessee's dealer statute permits a supplier to terminate a dealer agreement "whenever" a "major shareholder[] withdraws from the dealership or dies, or a substantial reduction occurs in the interest of a partner or major shareholder in the dealership." (*Id*. at 15 (quoting § 47-25-1302(a)(6)).) The court agrees. Significantly, the Agreement's assignment provision makes clear that Wirtgen "entered into this Agreement in reliance upon the representations and personal abilities of the current owners and managers of" Elliott & Frantz. (Doc. No. 15-1 § 9.05.) The Agreement goes further, providing that Elliott & Frantz's rights under the "Agreement are contingent upon the continuation of the present owners and managers of" the company. (*Id*.) Hence, "[a]ny . . . event

or transaction which results (whether by operation [of] law or otherwise) in a change of ownership or control of" Elliott & Frantz provides grounds for termination under Section 5.04(b)(1) and (6).

Jim's tragic passing meets the definition of an "assignment" in Section 9.05 because that "event" resulted in a "change of ownership or control" at Elliott & Frantz. (Doc. No. 15-1 § 9.05.) As a result, Wirtgen has the right to terminate the Agreement under Section 5.04(b)(6). *Accord JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 583 (6th Cir. 2007) (analyzing contract provisions on review of a Rule 12(c) motion because the "proper interpretation of a contract is a question of law").

The text of Tennessee's dealer statute also makes plain that statutory "good cause" exists for Wirtgen to terminate the Agreement. *See* Tenn. Code Ann. § 47-25-1302(a)(6). Although Elliott & Frantz may have certain rights to the repurchase of their Wirtgen-branded inventory under § 47-25-1309, that limited right does not affect Wirtgen's termination right in these circumstances.

For these reasons, Wirtgen's Motion for Judgment on the Pleadings on its counterclaim seeking a declaration that it has the right to terminate the Agreement under Sections 5.04 and 9.05 of the Agreement and Tennessee's dealer statute will be granted. (Doc. No. 60 ¶¶ 104–18.) As the court concludes that Wirtgen has the legal right to terminate the parties' relationship due to Jim Elliott's death, the court need not consider Elliott & Frantz's request to assert a new claim in its proposed Second Amended Complaint seeking to assert a claim under Tennessee's dealer statute. (Doc. No. 72-1 ¶¶ 123–32.) Elliott & Frantz's proposed claim relies on the allegation that Wirtgen consented to the transition in management control to Catherine. (*Id.* ¶¶ 129–32.) However, as explained above, Wirtgen seeks to terminate the parties' Agreement on other grounds, which have not been opposed by Elliott & Frantz. Even if Wirtgen had consented to Catherine's assumption of management duties, there is no allegation that Wirtgen consented to the assignment resulting

from Jim's death or his earlier transfer of an ownership interest to a trust. Those events provide Wirtgen with independent grounds to terminate the Agreement, which obviates the need to consider Elliott & Frantz's allegations regarding Wirtgen's consent and waiver of its right to refuse to Catherine's management of the company.

## V. CONCLUSION

For the foregoing reasons, Wirtgen's Motion for Judgment on the Pleadings will be granted in its entirety. Wirtgen's motion seeking a declaration of its rights under the Agreement will be granted. Counts 1 through 7 of the First Amended Complaint will be dismissed. The plaintiffs' Motion for Leave to File a Second Amended Complaint will be denied as futile. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge